Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiffs*
SAN JOAQUIN RAPTOR/WILDLIFE RESCUE
CENTER, and PROTECT OUR WATER

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN JOAQUIN RAPTOR/WILDLIFE RESCUE CENTER a non-profit corporation, and PROTECT OUR WATER, a non-profit association,<br><br>        Plaintiffs,<br><br>      v.<br><br>GREIF PACKAGING LLC, a California limited liability company,<br><br>        Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

San Joaquin Raptor/Wildlife Rescue Center and Protect Our Water ("SJR/WRC & POW" or "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.   On February 12, 2018, SJR/WRC & POW issued a 60-day notice letter ("Notice Letter") to Greif Packaging LLC ("Defendant.") The Notice Letter was specifically issued to Peter Watson, President and Chief Executive Officer of Greif Packaging LLC, Jun Dulai and Farrell Smith the General Managers of the Greif Packaging LLC facility in Merced California, and Agent for Service of Process listed with the California Secretary of State. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at the Greif Packaging LLC facility ("Facility" or "Greif Facility") located at 2400 Cooper Avenue Merced, California 95344. The Notice Letter informed Defendant of SJR/WRC's & POW's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.   The Notice Letter was sent to the President and CEO, and General Managers of the Greif Facility as the owners and operators of the Greif Facility, as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by

reference.

4. More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. SJR/WRC & POW are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5. Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6. Plaintiffs also seek relief from Defendant's violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## II. <u>INTRODUCTION</u>

7. With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Greif Facility, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, pH affecting substances, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate plus nitrite as nitrogen, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Greif Facility.[1]

10.     Stormwater discharged with high pH can damage the gills and skin of aquatic organisms and cause death at levels above 10 standard units. The pH scale is logarithmic and the solubility of a substance varies as a function of the pH of a solution. A one whole unit change in standard units ("s.u.") represents a tenfold increase or decrease in ion concentration. If the pH of water is too high or too low, the aquatic organisms living within it will become stressed or die.

11.     SJR/WRC & POW specifically allege violations regarding Defendant's discharge of pollutants from the Greif Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

## III.   PARTIES

### A.     San Joaquin Raptor/Wildlife Rescue Center and Protect Our Water

12.     Plaintiffs SJR/WRC & POW are a California non-profit corporation and a California non-

---

[1] The Greif Facility is fully described in Section V below.

profit association respectively, with their principal place of business in Merced, California. SJR/WRC & POW's organizational purposes are preserving wildlife habitats and the environment, including the waterways in the San Joaquin Valley, including but not limited to Black Rascal Creek, Bear Creek and the San Joaquin River upon which wildlife depends. SJR/WRC's & POW's efforts to protect the resources of the San Joaquin Valley include air and water quality, the preservation of agricultural land, and the protection of wildlife and its habitat. Both entities are also committed to public education regarding these various issues and ensuring governmental compliance with the law of this state. Members of SJR/WRC & POW use and enjoy California's numerous rivers, creeks and waterways for recreation and other activities, including Bear Creek, Black Rascal Creek and the San Joaquin River, where they view and enjoy wildlife, rescue and rehabilitate wildlife, boat, birdwatch, and engage in scientific study, among other things. SJR/WRC & POW's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the San Joaquin Valley watersheds.

13.     SJR/WRC & POW have approximately 1,800 members, collectively, who live, recreate and work in and around waters of the State of California, including the Bear Creek and the San Joaquin River watersheds. SJR/WRC & POW are dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, SJR/WRC & POW are actively seeking federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiating citizen enforcement. As referenced in Paragraph 12, members of SJR/WRC & POW use and enjoy the Receiving Waters herein into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of SJR/WRC's & POW's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiffs caused by Defendant's activities.

14.     Defendant's failures to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharges of

polluted stormwater and non-stormwater from the Greif Facility, negatively impact and impair SJR/WRC's & POW's members' use and enjoyment of these waters.

15.    Continuing commission of the acts and omissions alleged herein will irreparably harm SJR/WRC & POW's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owners and Operators of the Greif Facility**

16.    SJR/WRC & POW are informed and believe, and thereon allege, that Greif Packaging LLC is a limited liability company organized under the laws of California.

17.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant Greif Packaging LLC's agent for service of process with the Office of the California Secretary of State is United Agent Group Inc. with an address of 1430 Truxtun Avenue, 5th Floor Bakersfield, CA 93301

18.    SJR/WRC & POW are informed and believe, and thereon allege, that Greif Packaging LLC, Peter Watson, Jin Dulai and Farrell Smith are the Owners/Operators of the Greif Facility.

19.    Collectively, SJR/WRC & POW refer to Greif Packaging LLC, Peter Watson, Jin Dulai and Farrell Smith as "the Owners/Operators," defined herein as the Owners/Operators of the Greif Facility.

**IV.    STATUTORY BACKGROUND**

**A.    The Clean Water Act**

20.    Section 101(a) of the Clean Water Act, 33 U.S.C. § 1251(a) declares the goals and policy of the CWA, with the objective to restore and maintain chemical, physical, and biological integrity of the Nation's waters, and the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983. 33 U.S.C. § 1251(a)(2).

21.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

22.    Section 402(p) of the CWA establishes a framework for regulating municipal and

industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

23.   Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

24.   The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

25.   The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

26.   The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

27.   The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

28.   "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

29.   "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

30.   The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to

navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

31.  The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

32.  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

33.  A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

34.  Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

35.  The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

36.  An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

37.  Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after August 1, 2016 subjects the violator to a penalty of up to $51,570 per day. See 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

38.  Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and

consultants' fees.

**B.     California's Storm Water Permit**

39.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

40.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

41.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

42.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

43.     Under the applicable EPA regulations[2] all surface and ground waters of the State of California are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards unless a strict use attainability analysis is performed

---

[2] https://www.epa.gov/sites/production/files/2014-11/documents/ca-amend-resolution-88-63.pdf

based upon a structured scientific assessment of the factors affecting the attainment of uses specified in Section 101(a)(2) of the Clean Water Act (the so called "fishable/swimmable" uses). 40 CFR 131.10(a) and (g).

44.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.     On July 1, 2015, the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

46.     In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

47.     Section XII.C. of the 2015 Permit sets out specific actions permittees are required to take in response to an exceedance of the 2015 Permit's Numeric Action Levels ("NALs") referred to as Exceedance Response Actions ("ERAs"). An exceedance of an NAL is not a per se violation of the 2015 Permit, but failure to meet the ERA requirements is a 2015 Permit violation.

48.     There are two ERA levels: Level 1 and Level 2. The Greif Facility entered Level 2 following the 2016-2017 reporting year[3], submitting a Level 2 report for iron, aluminum, and zinc to the State Board dated December 28, 2017. That ERA report included a Level 1 evaluation for nitrate plus

---

[3] a reporting year runs from July 1 to June 30

nitrite nitrogen. A Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of the 2015 Permit. Section I(M) (Finding 63). For the 2015-2016 reporting year, the Greif Facility submitted a Level 1 report dated December 27, 2016 to the State Board for iron, aluminum, and zinc.

49.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding Best Management Practices ("BMPs") in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the 2015 Permit. *See* Permit, Section XII.C.l.a.-c. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section XII.C.l.c. Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via Storm Water Multiple Application Tracking System ("SMARTS," an online database for dischargers to electronically file their stormwater permit documents) a Level 1 ERA report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII.C.2.a.i.-ii. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. 2015 Permit, Section XII.C.2.a.iii. A permittee's Level 1 status for a parameter will return to baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sample subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII.C.2.b.

50.     A permittee's Level 1 status for any given parameter shall change to Level 2 status if

sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. *See* 2015 Permit, Section XII.D. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII.D. Permittees with Level 2 status are required to certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2-15 Permit, Section XII.D.1.a. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the permittee has selected to perform. *See* 2015 Permit, Section XII.D.1.a. The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *See* 2015 Permit, Section XII.D.l.c.

51.     On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that must adhere to series of requirements as detailed in Section XII.D.2.a.i through iii of the 2015 Permit.

52.     Dischargers with Level 2 status who submit an Industrial Activity BMPs Demonstration in accordance with subsection 2.a.i through iii and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four (4) subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). If future NAL exceedances occur for the same parameter(s), the Discharger's baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. These Dischargers shall update the Level 2 ERA Technical Report as required Section D.3.c of the 2015 Permit.

53.     Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation."  *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

/ / /

### C.     The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

54.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

55.     Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

56.     Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

57.     Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

58.     The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; Oil and Grease ("O&G") – 15 mg/L; lead ("Pb") – 0.069 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L; aluminum ("Al") – 0.75 mg/L; copper ("Cu") – 0.0123 mg/L; and zinc – 0.117 mg/L. The 2015

Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

59.     The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

60.     Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

61.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

62.     Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

63.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

64.     The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

65.     The State Water Quality Control Board, Central Valley Region (Revised July 2016), has issued the Water Quality Control Plan for the Central Valley Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan provides water quality objectives and special limits for dissolved oxygen levels in stretches of the San Joaquin River. The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." The Basin Plan sets forth water quality

objectives for dissolved metals, including arsenic, zinc, copper, iron, and mercury. *Id.*, Table III-1. The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id.*

66.     The Basin Plan also identifies present and potential beneficial uses for various hydrologic units leading to the Sacramento San Joaquin River Delta, with municipal and domestic supply, agricultural supply, warm and cold migration, contact and non-contact water recreation, cold and warm freshwater habitat, wildlife habitat, and warm and cold spawning among them.

67.     In addition to the de facto beneficial uses of swimming and fishing applicable to the Receiving Waters herein (*see* 40 CFR 131.10(a) and (g)), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units leading to the Sacramento San Joaquin River Delta, with municipal and domestic supply, agricultural supply, warm and cold migration, contact and non-contact water recreation, cold and warm freshwater habitat, wildlife habitat, and warm and cold spawning among them.

68.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan or deemed on a case-by-case basis would be designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2012 303(d) List of Impaired Water Bodies Bear Creek is listed for the following CWA 303(d) impairments: Escherichia coli (E. coli, Pathogens). According to the 2012 303(d) List of Impaired Water Bodies the Sacramento San Joaquin River Delta is listed for the following CWA 303(d) impairments: Cholrdane, DDT, Dieldrin, Dioxin Compounds, Furan Compounds, Invasive Species, Mercury, PCBs, and Selenium.[4] Thus, the receiving waters for pollution from the Greif Facility are impaired, and the Defendant's illegal discharges of pollutants above the WQS contributes to the continued impairment of the beneficial uses in the watershed.

69.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

---

[4] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml (last accessed on March 7, 2018.)

70.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[5]

71.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

72.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

**D.      The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

73.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

74.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact,

---

[5] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

75.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

76.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

77.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is

not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

78. The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.    The Storm Water Permit's Monitoring and Reporting Requirements**

79. The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id*. at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id*.

80. The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

81. The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id*., 1997 Permit Section B(2)(c) and B(2)(d).

82. The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

83. Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

84. Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

85.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

86.     The Storm Water Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

87.     Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

88.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

89.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

90.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

91.     Section B(5)(c)(iii) and Table D of the 1997 Permit, require facilities classified as Standard Industrial Classification ("SIC") code 3273, such as the Greif Facility, to also analyze stormwater samples for iron ("Fe"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

92.     Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

93.     Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

94.     Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

95.     Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

96.     Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

97.     Table 1 of the 2015 Permit requires Facilities under SIC code 3273, such as the Greif Facility, to analyze stormwater samples for iron. 2015 General Permit Tables 1-2.

98.     Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page

numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.   STATEMENT OF FACTS

### A.   The Greif Facility Site Description

99.   The Greif Facility primarily engages in the manufacturing of steel drums and other storage and packing materials, and shipping of finished manufactured product. According the Facility NOI, the site consists of ten (10) acres, all of which is exposed to industrial stormwater (the Facility SWPPP states the site size at 14.1 acres). About half of the site is either paved or covered by structures. The main production building is located on the east side of the property and is surrounded by an access road and parking areas. The truck entrance is adjacent to the northwest corner of the production building and trucks travel counter-clockwise along an access road circling the Facility. A shipping and receiving dock is on the west side of the production building, adjacent to the employee parking and trailer storage areas near the office building in the northwest corner of the Facility site. Materials are also delivered to and stored in and around the paint shed structure near the southwest corner of the production building. An unused rail spur bisects the property from the south. A waste dumpster is located at the southwest corner of the production building, adjacent to the loading dock and an unpaved area. Metal recycling bins are located in the northeast corner of the Greif Facility. Cardboard and pallet recycling are located in the southwest corner of the parking area.

100.   Pursuant to the Greif Facility's NOI and Storm Water Pollution Prevention Plan ("SWPPP") Greif Packaging LLC in Merced operates under Standard Industrial Classification ("SIC") Code 3412 – Metal Shipping Barrels, Drums, Kegs, and Pails.

101.   Industrial operations and activities taking place at the Greif Facility consist of the manufacture of industrial packaging products and services related to the packaging industry. Specifically, the Facility's main purpose is the manufacture of 5% galvanized steel drums and 5% tin-plate steel drums. Raw ingredients are delivered to the loading docks and paint shed with some raw materials, production materials, and industrial equipment stored outside. Recently unloaded materials are stored adjacent to the loading dock west of the office. Some maintenance of industrial equipment is performed outside, north of the paint shed. Finished product is loaded from docking bays at the Facility

into delivery trucks. Contractors deliver fuel to the Facility used to power industrial manufacturing equipment weekly. Unused equipment may be stored along the east side of the production building. The site features above ground storage tanks with a total capacity of 6,500 gallons. Materials and pollutants exposed to stormwater include the outdoor storage areas, scrap bins, vehicles, above ground storage tanks, roof structures, and fugitive dust. Metal shelving and metal scrap bins at the Greif Facility are sources and potential sources of metals in stormwater.

102.    Most manufacturing and industrial processes occur in the production building. Exhaust fans on the roof of the production building generate pollutants including metal particulates may that collect on surfaces which are later contacted by and discharged via stormwater. The buildings at the Greif Facility have metal roofing, a common source of zinc in stormwater discharges. Dust from unpaved roads and other unpaved areas onsite generate fugitive dust from vehicle travel and other industrial disturbances. Trackout from the production building contributes to metals and suspended solids in the Facility's stormwater discharges. Tracking of sediment and other pollutants collect on paved and unpaved areas at the Greif Facility and are discharged with stormwater. Other pollutant sources at the Greif Facility include but are not limited to, sediment buildup in the stormwater drainage systems dust from daily operations throughout the site, pollutants from vehicle and industrial equipment such as copper and other heavy metals, oil, grease and other lubricants, fine pollutant particles from daily operations deposited on and offsite the Facility and off the Facility through aerial deposition. These pollutants are later discharged or deposited into Black Rascal Creek, a tributary to Bear Creek, the Receiving Waters herein.

103.    Manufacturing wastes and hazardous materials at the Greif Facility consist of effluent sludge, used oil, washer solution, latex paint, plant debris, and absorbent oil. Hazardous wastes at the Facility consist of sodium hydroxide, potassium hydroxide, methyl ethyl ketone, and methyl isobutyl ketone. Hazardous materials are stored in in the paint shed and in designated areas inside the production building. Hazardous wastes are periodically disposed off-site.

104.    SJR/WRC & POW are informed and believe, and thereon allege, that each of the industrial activities, industrial areas, and industrial materials referenced herein impact and potentially impact stormwater and non-stormwater runoff and discharges at the Greif Facility.

105.    Pursuant to the Greif Facility NOI, the site collects and discharges polluted stormwater associated with industrial activities from the industrial operation into Black Rascal Creek. The Greif Facility SWPPP notes that stormwater discharges to the City of Merced's Municipal Separate Storm Sewer System ("MS4"), via three outfalls to the north of the Facility site. Stormwater runoff from paved areas flows to twelve onsite drop inlets, ten of which direct stormwater to the City system on Cooper Avenue via the three outfalls described above, which is then discharged to Black Rascal Creek less than a quarter mile to the northwest. Black Rascal Creek connects to Bear Creek, Bear Creek is less than a half a mile to the south of the Facility. Bear Creek and Black Rascal Creek are waters of the United States within the meaning of the CWA.

106.    SJR/WRC & POW are informed and believe, and thereon allege, that there are other locations at the Greif Facility discharging stormwater associated with industrial activities, namely from borders and other runoff areas of the Greif Facility. These discharges eventually enter Black Rascal Creek.

107.    Bear Creek (from Bear Valley to San Joaquin River, Mariposa and Merced Counties) is listed for the following water quality impairments on the 2012 Clean Water Act Section 303(d)-list: is listed for the following CWA 303(d) impairments: Escherichia coli and Unknown Toxicity. Stretches of the San Joaquin River, hydrologically connected to the receiving waters discused herein, have numerous, differing impairments listed on the 303(d)-impairment list.

108.    SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility areas described herein, lack adequate cover or secondary containment, and that industrial activities occur outside without cover or secondary containment, resulting in discharges of polluted stormwater. Vehicle and other traffic at the Greif Facility track dust and particulate matter, increasing the discharge of polluted water, sediments and debris into waters of the United States.

**B.    Bear Creek, Black Rascal Creek and the San Joaquin River.**

109.    Merced County is located in central California and situated across the center of the San Joaquin Valley and is located approximately 100 miles east of San Francisco. The foothills of the Sierra Nevada Mountains border Merced County on the east and are composed of gently rolling hills leading to the sharper terrain of the Sierra in the background. The western edge of Merced County is bounded on

the by coastal ranges. The aesthetics of the mountains and hills vary with the season, with golden brown hues through most of the year and green due to the winter rains. Seasonal contrasts of swollen rivers and lush hillsides and snowcapped mountain views add to the scenic nature of a thriving agricultural area. Preservation of natural riparian habitat, and scenic values of the County's streams, creeks, and lakes carry significant importance for the inhabitants of the area.

110.    Merced County is also home to certain critical habitat designations from the United States Fish and Wildlife Services, including areas home to the California tiger salamander a species listed as threatened by the U.S. Fish and Wildlife Service in 2004. Pollutants from industrial activities, among other threats, can destroy or degrade aquatic habitat essential for breeding and rearing for this and other species. Other species of concern known to inhabit the county are as follows: western spadefoot, western pond turtle, Swainson's hawk, Burrowing owl, Northern harrier, Loggerhead shrike, Tricolored blackbird, Western red bat, American badger, and San Joaquin kit fox. Other species of concern that depend on surface water in Merced County include all species of raptors, four (4) species of Fairy shrimp and eleven (11) floral species indigenous to vernal pools.

111.    The San Joaquin River is one of two major waterways into the Sacramento-San Joaquin Delta ("Delta"), which is California's most crucial water and ecological resource. The Delta is formed by the Sacramento River flowing south to meet the north-flowing San Joaquin River just south of Sacramento, where the rivers mingle with smaller tributaries and tidal flows. This expansive inland river delta and estuary in Northern California then extends to the western edge of the Central Valley.

### D.    The Greif Facility's Storm Water Permit Coverage

112.    SJR/WRC & POW are informed and believe, and thereon allege, that the Owners/Operators of the Greif Facility submitted an NOI for coverage under the 1997 Permit and first received coverage in 2009.

113.    SJR/WRC & POW is not currently in possession of any SWPPP's submitted prior to 2015 to cover the Greif Facility, but SJR/WRC & POW are informed and believe, and thereon allege, that the Owners/Operators of the Greif Facility, submitted an NOI for coverage under the 1997 Permit. Further information about coverage under the 1997 permit will be sought in discovery.

114.    SJR/WRC & POW are informed and believe, and thereon allege, that the

Owners/Operators of the Greif Facility submitted an NOI for their industrial operations on or about April 7, 2015, for coverage for the Greif Facility under the 2015 Permit.

115.   The State Board's electronic database SMARTS") lists the current Greif Facility Waste Discharge Identification ("WDID") number as 5F24I021710. SMARTS lists the Greif Facility's coverage under the Storm Water Permit as "Active."  The NOI for the Greif Facility identify the receiving water for discharges and runoff from the Greif Facility as Black Rascal Creek.

116.   Via search of the SMARTS database, SJR/WRC & POW obtained SWPPPs for the Greif Facility created in July 2015 and modified in August 2015, and updated SWPPPs for the Greif Facility dated November 14, 2016, April 17, 2017, and last, December 20, 2017 ("Greif Facility SWPPP").

117.   SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility SWPPP fails to describe and/or adequately describe all of the Greif Facility's industrial activities or processes.

118.   SJR/WRC & POW are informed and believe, and thereon allege, that because the Greif Facility's SWPPP fails to describe and/or adequately describe all of the Greif Facility's industrial activities, the Greif Facility SWPPP also fails to describe and/or adequately describe all of the significant materials and processes that are related to the Greif Facility's industrial activities.

119.   SJR/WRC & POW are informed and believe, and thereon allege, that pollutants associated with the Greif Facility include, but are not limited to: pH-affecting substances; metals, such as iron and aluminum; toxic metals, such as lead, zinc, copper, and mercury; N+N; TSS; gasoline and diesel fuels; other dust and dirt; and O&G.

120.   SJR/WRC & POW are informed and believe, and thereon allege, that without properly identifying all industrial activities or all significant materials at the Greif Facility in the SWPPP, the Owners/Operators have not developed and/or implemented all appropriate BMPs.

121.   SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility SWPPP includes no adequate assessments of potential pollutant sources, the associated pollutants, and the corresponding BMPs at the Greif Facility.

122.   SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility SWPPP includes no adequate description of the Greif Facility's BMPs, analyses of the effectiveness of

1  the BMPs, or summaries of the BMPs by pollutant source.

2      123.   SJR/WRC & POW are informed and believe, and thereon allege, that the

3  Owners/Operators have failed and continue to fail to develop the Greif Facility SWPPP and site-specific

4  BMPs consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

5      124.   SJR/WRC & POW are informed and believe, and thereon allege, that Defendant's

6  SWPPP fails and continues to fail to include an adequate: (1) list of significant materials handled and

7  stored at the site; (2) description of potential pollutant sources including industrial processes, material

8  handling and stockpiling areas, dust and particulate generating activities; (3) description of significant

9  spills and leaks; or (4) list of all non-stormwater discharges and their sources; Section A of the 1997

10  Permit and Section X of the 2015 Permit.

11      125.   SJR/WRC & POW are informed and believe, and thereon allege, that stormwater

12  sampling at the Greif Facility demonstrate that the Greif Facility's stormwater discharges contain

13  concentrations of pollutants above the Benchmark Levels, including but not limited to aluminum, iron,

14  N+N, zinc, and TSS.

15      126.   SJR/WRC & POW are informed and believe, and thereon allege, that the repeated and

16  significant exceedances of Benchmark Levels demonstrate that the Greif Facility's Owners/Operators

17  have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants

18  to stormwater and to prevent discharges of polluted stormwater and non-stormwater from the Greif

19  Facility.

20      127.   SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility

21  Owners/Operators have failed and continue to fail to adequately revise the Greif Facility SWPPP,

22  despite repeated and significant concentrations of pollutants in the Greif Facility's stormwater

23  discharges, to make changes to the Greif Facility's training programs, or to make any other changes

24  based upon events that would signal a need for required revisions or alteration of practices.

25      128.   SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility's

26  industrial operations are conducted outdoors without secondary containment or other measures to

27  prevent polluted stormwater from discharging from the Greif Facility.

28

129.    SJR/WRC & POW are informed and believe, and thereon allege, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Greif Facility's operation areas and offsite.

130.    SJR/WRC & POW are informed and believe, and thereon allege, that these pollutants are deposited into water bodies, and onto streets and/or into storm drains near to the Greif Facility via fugitive dust and other means, including but not limited to dust generated by wind, equipment and vehicles.

131.    SJR/WRC & POW are informed and believe, and thereon allege, that trucks and vehicles leaving the Greif Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease, metal particulates, and other pollutants off-site.

132.    SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with their industrial activities to precipitation, and that this results in discharges of polluted stormwater from the Greif Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

133.    SJR/WRC & POW are informed and believe, and thereon allege, that BAT/BCT for the Greif Facility is exemplary housekeeping practices, storage of materials that act as pollutant sources under cover or in contained areas, cover of certain industrial activities, aerial deposition control, erosion and sediment controls. treatment of stormwater to reduce pollutants before discharge (e.g., with adequate filters or treatment boxes), containment of industrial operations that cause the spread and release of pollutants, containment or removal of certain waste materials and inoperable industrial equipment, and/or to prevent stormwater discharge altogether at the Greif Facility.

134.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed to achieve compliance with BAT/BCT requirements at the Greif Facility by failing to implement proper housekeeping procedures, failing to provide cover of activities, by failing to contain pollutants in industrial or waste areas that cause the spread and release of pollutants, and/or failing to properly treat stormwater or significantly reduce the discharge of polluted stormwater.

135.    SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility

Complaint for Declaratory and Injunctive Relief        27
and Civil Penalties

1  Owners/Operators' failure to properly address these pollutants and their sources results in the exposure

2  of pollutants to precipitation, which carries these pollutants with stormwater flows from the Greif

3  Facility into the Receiving Waters herein.

4       136.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant's failure

5  to properly address these pollutants and their sources results in the discharge of fugitive dust, including

6  but not limited to dust generated by industrial operations, wind, equipment, and vehicles, which carries

7  these pollutants to off-site waterbodies, and to off-site properties, streets and storm drains adjacent to the

8  Greif Facility. Pollutants deposited off-site eventually flow into the Receiving Waters herein.

9       137.    SJR/WRC & POW are informed and believe, and thereon allege, that the

10  Owners/Operators of the Greif Facility have failed and continue to fail to meet the ERA reporting and

11  BMP implementation requirements of the 2015 Permit.

12  **E.    Stormwater Discharges at the Greif Facility**

13       138.    The Greif Facility Owners/Operators' SWPPP notes that the Greif Facility discharges

14  stormwater runoff to the Merced City Municipal Separate Storm Sewer System (MS4) via three (3)

15  outfalls in the northern portion of the site with some of the discharge entering the City's sewer system.

16       139.    Stormwater runoff from the paved areas of the Facility flows to twelve (12) onsite drop

17  inlets. Ten (10) drop inlets direct storm water flow to a subsurface storm water system that ultimately

18  discharge to the City's MS4 on Cooper Avenue via three (3) outfalls located along the northern edge of

19  the property. The MS4 discharges to Black Rascal Creek northwest of the Facility which connects to

20  Bear Creek.

21       140.    Pursuant to the Greif Facility SWPPP, Stormwater is discharged from the Facility at

22  Discharge Point 1, Discharge Point 2, and Discharge Point 3. The two (2) remaining storm water drop

23  inlets drain to the Facility's wastewater system and subsequently to the City's Waste Water Treatment

24  Facility.

25       141.    Samples are purported to be collected at the outfalls described as Discharge Point 1 at the

26  central north section of the Facility, Discharge Point 2 in the northwest of the Facility, and Discharge

27  Point 3 at the northeast end of the Facility. Discharge Point 1 collects stormwater from the western side

28  of the production building including the office building, loading/unloading areas, roof drains, visitor

parking, outdoor storage areas, and the Greif Facility's main entrance and exit. Discharge Point 2 collects and discharges stormwater from the generated along the Greif Facility border with Cooper Avenue, collecting stormwater from the trailer parking lot, the outdoor storage areas and the employee parking area. Discharge Point 3 collects stormwater from the northeast of the Greif Facility, areas that include the production building loading bay, equipment storage areas, scrap metal recycling storage area, and the northeast truck exit. Roof drains at the northeast of the building connect to a subsurface drain and, and upon information and belief, discharge from the Greif Facility at Discharge Point 2.

142.    The latest Greif Facility SWPPP also notes that the Owners/Operators conducted an investigation in September 2016 which indicated that the east portion of the Greif Facility drains north through a subsurface pipe system to the Discharge Point 3 drainage area. Further investigation from January 2017 established that the Facility's east side underground drainage system at Discharge Point 3 drained north separately to the City of Merced's storm drain system. Thus, until January of 2018 no representative stormwater samples were taken from this drainage area.

143.    Since the Greif Facility recorded averages of testing above Numeric Action Levels ("NAL") for iron, aluminum and zinc in both the 2015-16 and 2016-2017 reporting years, the Facility is currently at ERA Level 2 for those parameters for the 2017-2018 reporting year. Over the last two complete reporting years, the NAL average exceedances for metals have been at magnitudes well over two times for aluminum and iron, with individual samples recorded at or over ten times the NAL. In 2018 an aluminum sample was reported at 7.6 mg/L. For zinc, the NAL average of samples during the last two reporting years was over ten times the NAL. A single zinc sample from October of 2015 was reported at over thirty-eight times the NAL. An unreported downspout sample, as noted in the Greif Facility SWPPP, recorded in April 2016 was 9.4 mg/L and over thirty-six times the NAL.

144.    Since the Greif Facility's N+N samples were reported above the Annual NAL in the 2016-2017 reporting year, the Greif Facility is ERA Level 1 for that constituent for the 2017-2018 reporting year.

145.    The Greif Facility has also recently reported periodic TSS EPA Benchmark exceedances, including a result of 140 mg/L in 2017, and 110 mg/L in 2018.

146.    SJR/WRC & POW are informed and believe, and thereon allege, that the Greif Facility Owners/Operators have failed to properly collect samples from all discharge locations at the Greif Facility. As an example only, despite the Owners/Operators discovering in September of 2016[6] that Discharge Point 3 was not connected to a discharge location where samples representative of stormwater collected from Discharge Point 3 were actively being taken, no stormwater samples were taken for Discharge Point 3 in the 2016-2017 reporting year though there were over thirty-five rain events of over .1 inch recorded near the Grief Facility from October 2016 through May of 2017, within the 2016-2017 reporting year.

147.    SJR/WRC & POW are informed and believe, and thereon allege, that evidence exists from publicly available materials that the Owners/Operators fail to sample from each designated discharge point, and other locations discharging stormwater, during sampling events conducted at the Greif Facility.

**F.    The Greif Facility's Stormwater Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

148.    SJR/WRC & POW are informed and believe, and thereon allege, that pollutants from the Greif Facility discharge from multiple discharge points to Black Rascal Creek a tributary to Bear Creek.

149.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

150.    SJR/WRC & POW are informed and believe, and thereon allege, that Black Rascal Creek and Bear Creek, the Receiving Waters herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

---

[6] Pursuant to the Greif Facility SWPPP, the Owners/Operators further confirmed that Discharge Point 3 was independent in January 2017.

Complaint for Declaratory and Injunctive Relief          30
and Civil Penalties

151.    SJR/WRC & POW are informed and believe, and thereon allege, that polluted stormwater and non-stormwater discharges from the Greif Facility to the Receiving Waters.

152.    Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, aluminum, and iron adversely affect the aquatic environment.

153.    Samples of stormwater discharges collected at the Greif Facility contain pollutants including aluminum, zinc, iron, TSS, and N+N, in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

154.    SJR/WRC & POW are informed and believe, based upon Annual Reports and Monitoring Reports obtained from the Regional Board, that the Greif Facility reported multiple effluent exceedances from the 2013-2014, 2014-2015, 2015-2016, and 2016-2017 reporting years, including exceedances of aluminum, zinc, iron, and TSS. SJR/WRC & POW are informed and believe, and thereon allege, that there has been only a single stormwater sample analyzed and reported to SMARTS in the 2017-2018 reporting year, a violation of the 2015 Permit stipulation that two sampling events occur in the first half of the reporting year, and two occur in the second half of the reporting year. 2015 Permit XI.B.2.

155.    SJR/WRC & POW are informed and believe, and thereon allege, that during and/or after every significant rain event[7] or any other stormwater or non-stormwater discharge that has occurred at the Greif Facility since February 12, 2013 through the present, Defendant has discharged and continues to discharge stormwater and non-stormwater from the Greif Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

G.    **Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

156.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to develop an adequate M&RP for industrial operations at the Greif Facility that complies with Section B of the 1997 Permit, and Section XI of the 2105 Permit.

157.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has

_____

[7] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

failed and continues to fail to revise the M&RP for the Greif Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2105 Permit.

158.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

159.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to analyze stormwater samples collected at the Greif Facility for all toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharges, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

160.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to demonstrate that stormwater sampling limited to those listed in the Greif Facility's 2016 SWPPP, are representative of pollutants from the Greif Facility, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

161.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

162.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to adequately revise the M&RP for the Greif Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

163.     SJR/WRC & POW are informed and believe, and thereon allege, that the Owners/Operators of the Greif Facility consistently fail to perform visual observations of stormwater during QSEs.

164.     SJR/WRC & POW are informed and believe, and thereon allege, that the Owners/Operators of the Greif Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the

noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

165.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant's certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendant has not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit. A revised SWPPP has not been submitted to SMARTS following the recent Level 1 and Level 2 Exceedance Response Action Plans submitted by the Greif Facility.

166.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed to submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

167.    SJR/WRC & POW incorporate the allegations contained in the above paragraphs as though fully set forth herein.

168.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Greif Facility from stormwater discharges from the Greif Facility through implementation of BMPs that achieve BAT/BCT.

169.    SJR/WRC & POW are informed and believe, and thereon allege, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Greif Facility occur every time stormwater discharges from the Greif Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Greif Facility is a violation of the Storm Water Permit and the CWA. *See* 1997

Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

170.    The Owners/Operators and Defendant violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Greif Facility.

171.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

172.    Each day since at least February 12, 2013 that Defendant and the Owners/Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

173.    By committing the acts and omissions alleged above, the Defendant are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

174.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm SJR/WRC & POW has no plain, speedy, or adequate remedy at law.

175.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

176.    SJR/WRC & POW incorporate the allegations contained in the above paragraphs as though fully set forth herein.

177.    SJR/WRC & POW are informed and believe, and thereon allege, that discharges of

stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Greif Facility occur each time stormwater discharges from the Greif Facility.

178.    SJR/WRC & POW are informed and believe, and thereon allege, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Greif Facility each time stormwater discharges from the Greif Facility.

179.    The Defendant and their Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Greif Facility.

180.    SJR/WRC & POW are informed and believe, and thereon allege, that the Defendant's Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

181.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

182.    By committing the acts and omissions alleged above, Defendant and the Greif Facility Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

183.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, Plaintiffs' members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

184.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Non-Stormwater in Violation
of the Storm Water and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

185.     SJR/WRC & POW incorporate the allegations contained in the above paragraphs as though fully set forth herein.

186.     SJR/WRC & POW are informed and believe, and thereon allege, that prohibited non-stormwater discharges have discharged and continue to discharge from the Facilities, in violation of the Storm Water Permit and/or CWA Section 301(a), 33 U.S.C. § 1311(a).

187.     SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners' and/or Operators' violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

188.     Each and every violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

189.     By committing the acts and omissions alleged above, the Defendant and the Greif Facility Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

190.     An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

191.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Storm Water Pollutant Prevention Plan in Violation of the
Storm Water Permit and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

192.     SJR/WRC & POW incorporate the allegations contained in the above paragraphs as

1    though fully set forth herein.

2        193.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the

3    Owners/Operators have failed and continue to fail to develop adequate SWPPPs for the Greif Facility, in

4    violation of the Storm Water Permit.

5        194.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the

6    Owners/Operators have failed and continue to fail to adequately implement SWPPPs for the Greif

7    Facility, in violation of the Storm Water Permit.

8        195.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the

9    Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Greif Facility,

10   in violation of the Storm Water Permit.

11       196.    Defendant and the Owners/Operators have been in violation of the Storm Water Permit at

12   the Greif Facility every day from February 12, 2013 to the present.

13       197.    Defendant's and the Owners' and/or Operators' violations of the Storm Water Permit and

14   the CWA at the Greif Facility are ongoing and continuous.

15       198.    Defendant and the Owners/Operators will continue to be in violation of the Storm Water

16   Permit and the CWA each and every day Defendant and the Owners/Operators fail to adequately

17   develop, implement, and/or revise the SWPPP for the Greif Facility.

18       199.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Greif

19   Facility is a separate and distinct violation of the CWA.

20       200.    By committing the acts and omissions alleged above, Defendant and the

21   Owners/Operators are subject to an assessment of civil penalties for each and every violation of the

22   CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the

23   CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

24       201.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the

25   CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

26   irreparably harm SJR/WRC & POW, their members, and the citizens of the State of California, for

27   which harm they have no plain, speedy, or adequate remedy at law.

28       202.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

203.    SJR/WRC & POW incorporate the allegations contained in the above paragraphs as though fully set forth herein.

204.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners/Operators have failed and continue to fail to develop an adequate M&RP for the Greif Facility, in violation of the Storm Water Permit.

205.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners/Operators have failed and continue to fail to adequately implement an M&RP for the Greif Facility, in violation of the Storm Water Permit.

206.    SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners/Operators have failed and continue to fail to adequately revise an M&RP for the Greif Facility, in violation of the Storm Water Permit.

207.    Defendant and the Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Greif Facility every day from February 12, 2013 to the present.

208.    Defendant's and the Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the Greif Facility are ongoing and continuous.

209.    Defendant and the Owners/Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facilities.

210.    Each and every violation of the Storm Water Permit's M&RP requirements at the Greif Facility is a separate and distinct violation of the CWA.

211.    By committing the acts and omissions alleged above, Defendant and the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the

CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

212.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm SJR/WRC & POW, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

213.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

<u>**SIXTH CAUSE OF ACTION**</u>
**Defendant's Failure to Report as Required by the Storm Water**
**Permit in Violation of the Storm Water Permit and the**
**Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

214.   SJR/WRC & POW incorporate the allegations contained in the above paragraphs as though fully set forth herein.

215.   Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to prevent or reduce any pollutant in stormwater discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into a Facility's SWPPP.

216.   Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

217.   SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

218.   SJR/WRC & POW are informed and believe, and thereon allege, that Defendant's and the Owners' and/or Operators' Annual Reports for the Greif Facility failed and continue to fail to meet

the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

219.   SJR/WRC & POW are informed and believe, and thereon allege, that Defendant and the Owners/Operators have failed and continue to fail to submit complete Annual Reports for the Greif Facility to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

220.   Defendant and the Owners/Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least February 12, 2013.

221.   Defendant and the Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Greif Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit.

222.   Defendant and the Owners/Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least February 12, 2013.

223.   Defendant's and the Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

224.   By committing the acts and omissions alleged above, Defendant and the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 12, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

225.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm SJR/WRC & POW, their members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

226.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiffs pray for judgment against Defendant as set forth hereafter.

## VII.   <u>RELIEF REQUESTED</u>

227.   Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.      A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Greif Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.      A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.      A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.      A Court order assessing civil monetary penalties for each violation of the CWA occurring on or after November 2, 2015 at $51,750 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

e.      A Court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Any other relief as this Court may deem appropriate.

Dated: April 16, 2018                               Respectfully submitted,


Anthony M. Barnes
AQUA TERRA AERIS LAW GROUP
Attorneys for Plaintiffs
SAN JOAQUIN RAPTOR/WILDLIFE RESCUE
CENTER, and PROTECT OUR WATER